SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| IN RE NICKOLAS S. | ) | Arizona Supreme Court |
| | ) | No. CV-10-0092-PR |
| | ) | |
| | ) | Court of Appeals |
| | ) | Division One |
| | ) | No. 1 CA-JV 09-0147 |
| | ) | |
| | ) | Maricopa County |
| | ) | Superior Court |
| | ) | No. JV173845 |
| | ) | |
| | ) | |
| | ) | **O P I N I O N** |
| | ) | |

Appeal from the Superior Court in Maricopa County
The Honorable Joan M. Sinclair, Commissioner

**VACATED**

_____

Opinion of the Court of Appeals, Division One
224 Ariz. 52, 226 P.3d 1038 (2010)

**VACATED**

_____

CHRISTINA M. PHILLIS, MARICOPA COUNTY JUVENILE PUBLIC          Phoenix
DEFENDER
     By   Ellen Edge Katz, Deputy Juvenile Public Defender
Attorneys for Nickolas S.

MARICOPA COUNTY ATTORNEY'S OFFICE                              Phoenix
     By   Linda Van Brakel, Deputy County Attorney
Attorneys for State of Arizona

_____

**B A L E S**, Justice

¶1        Nickolas S. was adjudicated delinquent for violating

Arizona Revised Statutes ("A.R.S.") section 15-507 (2009), which

makes it a crime for a person to "knowingly abuse[]" teachers or other school employees. The court of appeals held, and the State does not contest, that when pure speech is involved, the statute applies only to "fighting words." The limited issue before us is therefore whether this case involves fighting words as defined by the United States Supreme Court. Although Nickolas insulted a teacher with derogatory and offensive words (and was suspended from school for doing so), we must vacate his juvenile adjudications because his words were not inherently likely to provoke a violent reaction by the teacher.

**I.**

¶2    Nickolas was adjudicated delinquent for two counts of violating A.R.S § 15-507. The first count concerned an incident when Nickolas was assigned to a classroom for students serving on-campus suspension. Nickolas refused to give the teacher his cell phone after she saw him using it in class. She called security, and Nickolas said "bitch" under his breath.

¶3    The second count stemmed from an incident two days later involving the same teacher. Nickolas asked to be sent to another classroom. The teacher told him to wait while she obtained administrative approval. After ten or fifteen minutes, Nickolas yelled, "This is stupid, I want to go to [Room] 205." The teacher again asked him to wait. Nickolas began playing with his cell phone. When the teacher told him to put it away,

2

he refused and began arguing. Other students noticed the disruption and some stood up; the teacher testified that the "whole room basically lost control." Nickolas yelled "This is fucking bull shit" and "You're a fucking bitch" while looking at the teacher in a challenging manner from about ten feet away. Disregarding his teacher's instructions, Nickolas left the classroom, yelling "Fucking bitch" and "You stupid bitch." When the teacher looked out the door to see where he was going, he shouted "Get away from me you fucking bitch."

¶4 Nickolas was suspended from school for ten days for his outbursts. Apart from his suspension, Nickolas was also charged with violating A.R.S § 15-507. At his adjudication hearing, Nickolas did not dispute the facts but argued that his speech was protected by the First Amendment. The juvenile court rejected this argument, adjudicated him delinquent on both counts, and placed him on summary probation.

¶5 The court of appeals vacated the adjudication for the first incident but affirmed as to the second. *In re Nickolas S.*, 224 Ariz. 52, 59 ¶ 29, 226 P.3d 1038, 1045 (App. 2010). Noting that A.R.S. § 15-507 may encompass constitutionally protected speech, and thus is facially overbroad, the court of appeals held that the statute could be constitutionally applied in cases involving speech only if it is narrowed to fighting words – "[t]hose personally abusive epithets which, when

3

addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." *Id.* at 58 ¶¶ 22–23, 226 P.3d at 1044 (citation omitted). The court concluded that the first incident, when Nickolas said "bitch" under his breath, could not support a delinquency charge under A.R.S § 15-507. *Id.* at 58–59 ¶ 25, 226 P.3d at 1044–45. The court concluded, however, that the second incident was one in which "a reasonable person in these circumstances might well react violently when confronted with such repeated, angry, and personal epithets." *Id.* at 59 ¶ 28, 226 P.3d at 1045.

¶6      Nickolas petitioned for review, arguing that the court of appeals misapplied the fighting words doctrine by focusing on the theoretical reaction of a hypothetical reasonable person instead of the likely reaction of the teacher addressed by the speech. We have jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24.

## II.

¶7      Before we turn to the precise issue presented, "it is useful first to canvass various matters which this record does not present." *Cohen v. California*, 403 U.S. 15, 18 (1971).

### A.

¶8      This case does not concern the propriety of school discipline. Although students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse

4

gate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969), schools may discipline students for certain speech that would be constitutionally protected if made by non-student speakers outside a school setting, *see, e.g.*, *Morse v. Frederick*, 551 U.S. 393, 409–10 (2007) (upholding discipline for displaying, at a school-sanctioned event, a banner encouraging illegal drug use); *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986)(upholding discipline for a student's "offensively lewd and indecent speech" at a school assembly). Nickolas acknowledged below that his conduct was appropriately subject to school discipline, and he has not challenged his ten-day suspension. Recognizing that a school may discipline a student for a profanity-laced classroom outburst, we need not here address more generally the constitutional limits on school discipline for student comments.

¶9 We also do not consider the application of other criminal statutes to conduct like that displayed by Nickolas. Arizona's criminal code includes provisions that not only punish threats, intimidation, assaults, and disorderly conduct in general, but also more specifically prohibit assaults and disruptive conduct in schools. *See* A.R.S. §§ 13-1202 (threatening and intimidation), -1203 (assault), -1204(A)(8)(d) (aggravated assault of school employee), -2904 (disorderly conduct), -2911 (interference with or disruption of

5

educational institution).  Consistent with the First Amendment, states and local governments may impose criminal sanctions under narrowly drawn statutes for conduct that disrupts classrooms or other school activities.  *See Grayned v. City of Rockford*, 408 U.S. 104, 118–19 (1972).  Nickolas, however, was not charged with violating any statute targeting the disruption of school activities.

**B.**

¶10   Nickolas was instead charged with violating A.R.S. § 15-507, which appears among Arizona's education statutes and provides:

> A person who knowingly abuses a teacher or other school employee on school grounds or while the teacher or employee is engaged in the performance of his duties is guilty of a class 3 misdemeanor.

¶11   Although § 15-507 has a long history that predates statehood, this Court has never interpreted its scope.  When first adopted, the statute made it a crime for a person to "insult or abuse any teacher in the presence of the school." 1901 Territorial Code § 606; *see also* Ariz. Penal Code, tit. XIV, § 696 (1913) (same).  In 1978, the statute was expanded to make it unlawful for a person to "knowingly insult[] or abuse[] a teacher on school grounds or while the teacher is engaged in the performance of his duties."  1978 Ariz. Sess. Laws, ch. 201, § 255.  The legislature last amended the statute in 1989 by

6

deleting the proscription on "insults" while extending the statute to prohibit the "abuse" not only of teachers but also other school employees. 1989 Ariz. Sess. Laws, ch. 124, § 1.

¶12 We have no occasion here to conclusively define the reach of A.R.S. § 15-507. The court of appeals held, and the State does not dispute, that Nickolas was prosecuted based solely on his speech. Nickolas did not argue below that the statute does not apply to pure speech, an interpretation that could be supported by the fact that the 1989 amendment deleted the word "insults" from the statute. The State, without advocating this interpretation, acknowledged before this Court that the history of A.R.S. § 15-507 may reflect an intent by some legislators to limit the statute to cases involving physical abuse. We assume, but do not decide, that the current statute may apply to certain speech absent any physical abuse.

¶13 But if the statute does apply to pure speech, the question then becomes "what kind of speech?" The First Amendment bars states from punishing "the use of words or language not within 'narrowly limited classes of speech.'" *Gooding v. Wilson*, 405 U.S. 518, 521–22 (1972) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571 (1942)). The limited categories of unprotected speech include fighting words. *Id.* at 523; *see also United States v. Stevens*, 130 S. Ct. 1577, 1584 (2010) (discussing traditional categories of unprotected

7

speech). A "statute must be carefully drawn or be authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression." *Gooding*, 405 U.S. at 522.

¶14 Nickolas argued below that A.R.S. § 15-507 is unconstitutionally overbroad and vague. The court of appeals held that Nickolas has standing to assert these constitutional challenges and that the statute is overbroad, but that the statute could withstand a First Amendment challenge if it is limited to fighting words in cases involving pure speech. 224 Ariz. at 58 ¶ 22, 226 P.3d at 1044. The State has not challenged the court of appeals' holding regarding standing, and we therefore today assume Nickolas has standing to raise the overbreadth argument. *Cf. State v. W. Union Fin. Servs., Inc.*, 220 Ariz. 567, 569 ¶ 10, 208 P.3d 218, 220 (2009) (noting the narrowing of issues where state had not challenged certain determinations by court of appeals).

¶15 If A.R.S. § 15-507 applies to pure speech, it is undeniably overbroad. By its terms, § 15-507 declares that it is a crime for any "person" to "abuse[]" a teacher or other school employee "on school grounds" or while the teacher or employee is "engaged in . . . his duties." "Abuse" is not statutorily defined. In ordinary usage, the word "abuse" means "[t]o hurt or injure by maltreatment; ill-use" or "[t]o assail

8

with contemptuous, coarse, or insulting words; revile." *The American Heritage Dictionary* 8 (4th ed. 2000).

¶16     If "abuse" includes contemptuous, coarse, or insulting words, the statute would extend to a broad range of protected speech directed at school employees while on school grounds or engaged in their duties. *Cf. Gooding*, 405 U.S. at 525 (noting that dictionary definition of "abusive" extends beyond fighting words). As the court of appeals noted, one could easily formulate statements that would fall within the reach of the statute that are otherwise protected by the First Amendment. 224 Ariz. at 57 ¶ 20, 226 P.3d at 1043. Indeed, the statute arguably would extend to a spectator who jeers at the visiting team's coach during a high school football game. The State itself acknowledged that the statute is facially overbroad.

¶17     The court of appeals noted, however, that determining A.R.S. § 15-507 is overbroad does not end the inquiry because courts have a "duty to save a statute, if possible, by construing it so that it does not violate the constitution." 224 Ariz. at 57-58 ¶ 21, 226 P.3d at 1043-44 (quoting *Readenour v. Marion Power Shovel*, 149 Ariz. 442, 445, 719 P.2d 1058, 1061 (1986)) (internal quotation marks omitted). At the State's urging, the court of appeals concluded that § 15-507 can be upheld by limiting its reach to fighting words in cases involving pure speech. *Id.* at 58 ¶ 22, 226 P.3d at 1044.

9

¶18    Although courts properly construe statutes to uphold their constitutionality, courts cannot salvage statutes by rewriting them because doing so would invade the legislature's domain. *First Nat'l Bank of Ariz. v. Superior Court of Maricopa Cnty.*, 112 Ariz. 292, 295, 541 P.2d 392, 395 (1975); *cf. Stevens*, 130 S. Ct. at 1592 (making same observation in interpreting federal statute). Rather than adopting narrowing constructions, several other courts have held that statutory prohibitions on "teacher abuse" are facially unconstitutional. *See Shoemaker v. State*, 38 S.W.3d 350, 355 (Ark. 2001) (similar statute overbroad and vague); *Ketchens v. Reiner*, 239 Cal. Rptr. 549, 553–54 (App. 1987) (same); *Commonwealth v. Ashcraft*, 691 S.W.2d 229, 232–33 (Ky. App. 1985) (same); *State v. Reyes*, 700 P.2d 1155, 1159 (Wash. 1985) (same). Nickolas has not argued that the court of appeals erred in adopting a narrowing construction to uphold A.R.S. § 15-507, so we assume for present purposes that the statute is not fatally overbroad or vague if narrowed to apply to fighting words.

## III.

¶19    The fighting words doctrine originated in the Supreme Court's 1942 decision in *Chaplinsky v. New Hampshire*. 315 U.S. at 571–73. Chaplinsky called a city marshal "a God damned racketeer" and a "damned fascist" and was convicted of violating a statute making it unlawful to publicly address another person

10

with "offensive, derisive or annoying word[s]." *Id.* at 569. In rejecting Chaplinsky's arguments that the statute violated the First Amendment, the Court broadly observed:

> There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words - those which by their very utterance inflict injury or tend to incite an immediate breach of the peace.

*Id.* at 571-72 (footnotes omitted).

¶20 The statute at issue in *Chaplinsky* had been "authoritatively construed" by the New Hampshire Supreme Court to apply only to words that "have a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed." *Id.* at 572-73. Noting that the addressee's subjective reaction is not determinative, the state court said:

> The test is what men of common intelligence would understand would be words likely to cause an average addressee to fight. * * * The English language has a number of words and expressions which by general consent are 'fighting words' when said without a disarming smile. * * * Such words, as ordinary men know, are likely to cause a fight.

*Id.* at 573. The state court concluded that "[t]he statute, as construed, does no more than prohibit the face-to-face words plainly likely to cause a breach of the peace by the addressee . . . ." *Id.* The Supreme Court in *Chaplinsky* held that "[w]e are unable to say that the limited scope of the

11

statute as thus construed contravenes the constitutional right of free expression." *Id.*

¶21    Since *Chaplinsky*, the Court has narrowed both the fighting words doctrine and the categories of unprotected speech.    For example, the Court has held that fighting words must be directed personally to an addressee and that words may not be proscribed merely to maintain a suitable level of discourse or because they may tend to provoke a violent reaction.  *Cohen*, 403 U.S. at 20, 23-24.

¶22    In *Cohen,* the Court held that the First Amendment barred the prosecution of a person for wearing a jacket with the words "Fuck the Draft."    *Id.* at 26.    The Court said that fighting words are "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction."   *Id.* at 20 (citing *Chaplinsky*, 315 U.S. 568).    The Court concluded that "[n]o individual actually or likely to be present could reasonably have regarded the words on [Cohen's] jacket as a direct personal insult."  *Id.*   *See also Texas v. Johnson*, 491 U.S. 397, 409 (1989) (characterizing fighting words as those an onlooker would consider a "direct personal insult or an invitation to exchange fisticuffs").

¶23    The Court has also recognized that words must be considered in the context in which they are spoken to assess

12

their character as fighting words.  In *Gooding*, the Court struck down a Georgia statute proscribing the use of "opprobrious words or abusive language, tending to cause a breach of the peace." 405 U.S. at 519.  The Court concluded that the statute had not been narrowly construed to apply only to words that have "a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed." *Id.* at 524 (quoting *Chaplinsky*, 315 U.S. at 573) (internal quotation marks omitted). Instead, the state courts had applied the law to "utterances where there was no likelihood that the person addressed would make an immediate violent response." *Id.* at 528; *see also Lewis v. City of New Orleans,* 415 U.S. 130, 135 (1974) (Powell, J., concurring) ("[W]ords may or may not be 'fighting words,' depending upon the circumstances of their utterance."); *Cohen*, 403 U.S. at 20 (recognizing that words were not used "in this instance" in a personally provocative fashion); *cf. Johnson*, 491 U.S. at 409 (noting that speech cannot be punished as incitement without "careful consideration of the actual circumstances").

¶24    Based on the Supreme Court's decisions, we agree with the Washington Supreme Court that analyzing whether particular speech constitutes fighting words involves a three-step inquiry. *City of Seattle v. Camby*, 701 P.2d 499, 501 (Wash. 1985). "First, the words must be directed at a particular person or group of persons.  There must be an addressee."  *Id.*  Second,

13

the words must be personally abusive epithets or insults that "when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." *Id.* (quoting *Cohen*, 403 U.S. at 20). Third, the words must be evaluated in the context in which they are used to determine if it is likely that the addressee would react violently. *See id.* at 501-02; *see also Gooding*, 405 U.S. at 524; *Citizen Publ'g Co. v. Miller*, 210 Ariz. 513, 519–20 ¶ 25, 115 P.3d 107, 113–14 (2005) (concluding that a letter to the editor did not constitute fighting words because it was not a "face-to-face confrontation" or "directed toward any particular individual," did not contain "personally abusive words or epithets," and was not "likely to provoke a violent reaction by the reader").

¶25     With respect to assessing the circumstances in which words are used, the Supreme Court has not been entirely clear about the relevance of the characteristics of the particular addressee. *Chaplinsky* recognized that the state court had observed that the test for fighting words turns on the reactions of "men of common intelligence" or the "average addressee" rather than the subjective reactions of the actual addressee. 315 U.S. at 573. Subsequent decisions have referenced the reaction of an "ordinary citizen," *Cohen*, 403 U.S. at 20, but have also required consideration of the "likelihood that the

14

person addressed would make an immediate violent response." *Gooding*, 405 U.S. at 528.

¶26    The underlying rationale for the fighting words doctrine is that some speech may be suppressed because it would likely provoke an immediate violent reaction by the person to whom it is addressed. *See Cohen*, 403 U.S. at 20. "The addressee's personal disagreement with or anger over words said to him does not, by itself, mean that the words can be punished as fighting words." *Camby*, 701 P.2d at 501. First Amendment protections should not dissolve merely because words are spoken to a particularly sensitive or combative addressee. *See id.; cf. Cohen*, 403 U.S. at 23 (speech may not be suppressed based merely on possible reaction of persons with "lawless and violent proclivities").

¶27    But this does not mean that all characteristics of the addressee should be ignored in determining if speech constitutes fighting words. The Supreme Court has directed that words must be considered in the specific context in which they are spoken to determine if they likely will provoke a violent response. That context should include objectively discernible attributes or characteristics, such as occupation, of the particular addressee. *See Lewis*, 415 U.S. at 135 (Powell, J., concurring) (noting that properly trained police officer may be expected to exercise greater restraint than ordinary citizen); *Camby*, 701

15

P.2d at 502.  Stated differently, it is necessary to determine whether an "average addressee" in the circumstances of the actual addressee would likely react violently to the words.  *See Camby*, 701 P.2d at 502; *see also In re John M.*, 201 Ariz. 424, 428 ¶ 20, 36 P.3d 772, 776 (App. 2001) (affirming delinquency adjudication based on racial slurs "likely to provoke a violent reaction when addressed to an ordinary citizen of African-American descent."); *In re Louise C.*, 197 Ariz. 84, 86 ¶ 8, 3 P.3d 1004, 1006 (App. 1999) (juvenile's derogatory language to principal did not constitute fighting words because "[it] was not likely to provoke an ordinary citizen to a violent reaction, and it was less likely to provoke such a response from a school official").

¶28     The court of appeals here acknowledged that "courts should consider the listener's status and context, and may take into account his or her subjective reaction in assessing whether speech rises to the level of fighting words."  *In re Nickolas*, 224 Ariz. at 59 ¶¶ 27-28, 226 P.3d at 1045.  Noting that "a reasonable person in these circumstances might well react violently when confronted with such repeated, angry, and personal epithets" as were uttered by Nickolas, the court of appeals affirmed the adjudication of delinquency for the second incident.  *Id.* at 59 ¶¶ 28-29, 226 P.3d at 1045.  For purposes of the fighting words doctrine, however, the inquiry is not

16

whether a reasonable person "might" react violently, but instead whether someone in the circumstances of the addressee would likely react violently in the context in which the words were spoken.

¶29    The addressee here was a teacher monitoring students in an on-campus suspension classroom. Nickolas vulgarly insulted the teacher from about ten feet away by calling her a "fucking bitch"; he repeated this insult and also shouted "stupid bitch" while leaving the classroom, and he then again shouted "fucking bitch" in the hallway while the teacher was watching him from the classroom door. Considering the circumstances in which Nickolas uttered his words, we do not believe that his insults would likely have provoked an ordinary teacher to "exchange fisticuffs" with the student or to otherwise react violently. *Cf. Johnson*, 491 U.S. at 409 (holding that flag burning did not "fall within that small class of 'fighting words'").

¶30    We do not believe that the natural reaction of the average teacher to a student's profane and insulting outburst, unaccompanied by any threats, would be to beat the student. Arizona teachers exemplify a higher level of professionalism, as the conduct of the teacher involved here reflected. Nickolas's conduct, although reprehensible, is properly punished through school discipline or possibly prosecution under other statutes

17

rather than by characterizing it as fighting words likely to provoke a violent reaction by his teacher.

**IV.**

¶31    We reverse the decision of the court of appeals insofar as it affirms the adjudication of delinquency for the second incident, we vacate the opinion of the court of appeals, and we vacate the juvenile court's order of adjudication as to both counts.


_____
                    W. Scott Bales, Justice

CONCURRING:


_____
Rebecca White Berch, Chief Justice


_____
Andrew D. Hurwitz, Vice Chief Justice


_____
A. John Pelander, Justice


_____
Joseph W. Howard, Judge[*]

_____

[*] Pursuant to Article 6, Section 3 of the Arizona Constitution, the Honorable Joseph W. Howard, Chief Judge of the Arizona Court of Appeals, Division Two, was designated to sit in this matter.

**P E L A N D E R**, Justice, concurring

¶**33**    I join in the Court's opinion because it narrowly and correctly holds that Nickolas' "words were not inherently likely to provoke a violent reaction by the teacher." *Supra*, ¶ 1.  I write separately, however, to make clear the following points.

¶**34**    Whether the constitutionality of A.R.S. § 15-507 is properly analyzed under the "fighting words" doctrine, or whether the statute's constitutional reach is limited to fighting words, are issues that are not before us and, therefore, neither addressed nor resolved by our opinion today. Rather, we decide the case on very discrete grounds, limited to the sole issue raised on review and argued by the parties: whether Nickolas' words constitute "fighting words," as delineated by the United States Supreme Court.

¶**35**    That issue is different from the question of whether Nickolas' profanity-laced tirade against the teacher in a classroom setting was covered and protected by the First Amendment.  As to that question, I flatly reject Nickolas' contention at oral argument that he had a constitutional right to say what he did to the teacher.  He did not.  *See, e.g.*, *Morse v. Frederick*, 551 U.S. 393, 400, 406 n.2 (2007) (holding that student did not have "a First Amendment right" to wield banner that said "BONG HiTS 4 JESUS" at off-campus, school-approved event, and noting that "First Amendment rights are

19

'applied in light of the special characteristics of the school environment'") (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)); *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986) ("[T]he constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings."); *see also Grayned v. City of Rockford*, 408 U.S. 104, 117-18 (1972) (rejecting notion that one "has an absolute constitutional right to use all parts of a school building . . . for his unlimited expressive purposes" when the "forbidden conduct 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others'") (quoting *Tinker*, 393 U.S. at 513).

¶36          Constitutional considerations aside, I also believe that Nickolas' verbal barrage against the teacher here constituted "abuse" within the meaning of § 15-507 and, therefore, was statutorily proscribed.[1]  *See In re Paul M.*, 198 Ariz. 122, 126-27 ¶¶ 13-19, 7 P.3d 131, 135-36 (App. 2000)

---

[1]   We generally do not reach constitutional issues if the case can be decided on statutory grounds. *See State v. Gomez*, 212 Ariz. 55, 61 ¶ 31, 127 P.3d 873, 879 (2006); *Petolicchio v. Santa Cruz County Fair & Rodeo Ass'n*, 177 Ariz. 256, 259, 866 P.2d 1342, 1345 (1994); *cf. State v. Korzuch*, 186 Ariz. 190, 195, 920 P.2d 312, 317 (1996) (recognizing general rule but addressing constitutional issue when it predominated throughout litigation and no alternative "grounds were raised or argued by either party").  Given the parties' framing and briefing of the single, limited issue presented on review, however, the Court correctly observes that "[w]e have no occasion here to conclusively define the reach of A.R.S. § 15-507." *Supra*, ¶ 12.

20

(Pelander, J., dissenting) (in case in which no constitutional issues were raised or addressed, arguing that juvenile's loudly and aggressively directing profanity at teacher's aide on school grounds, in presence of other students, constituted "abuse" under § 15-507). My concurrence in the Court's correct resolution of the narrow constitutional issue presented here does not alter my view on these points.

_____
A. John Pelander, Justice